## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

UNITED STATES TRUSTEE,

     *Plaintiff,*

        v.

JAMES M. PACK,

     *Defendant.*

:
:
:
:
:
:
:
:
:
:
:
:

Case No. 2:23-cv-00673

District Judge Jeffery P. Hopkins

---

## OPINION AND ORDER

---

The United States Trustee (the "UST") brought this action seeking to deny the Debtor, James M. Pack, a discharge under 11 U.S.C. § 727. The UST alleges that the Debtor concealed property in violation of § 727(a)(2) and made a false oath on his schedules in violation of § 727(a)(4) by failing to disclose his ownership interest in several businesses, and that he failed to preserve business records in violation of § 727(a)(3). Following a bench trial, the Court finds, for the reasons stated below, that the Debtor violated § 727(a)(3) by failing to maintain business records and that the Debtor should therefore be denied a discharge in his bankruptcy case.

### I.   Jurisdiction and Constitutional Authority

This adversary proceeding was filed and heard before the undersigned while a judge on the United States Bankruptcy Court for the Southern District of Ohio. After being appointed to the district court, a court which has original jurisdiction over bankruptcy cases, the undersigned entered an order withdrawing the reference under 28 U.S.C. § 157(d) for

cause and on joint motion of the parties. Distr. Doc. 3.[1] When the trial was held, the bankruptcy court had jurisdiction, under 28 U.S.C. § 1334(b) and the general order of reference entered in this district under 28 U.S.C. § 157(a), to hear and determine this matter— a core proceeding under 28 U.S.C. § 157(b)(2)(J). Because a debtor's entitlement to a discharge "stems from the bankruptcy itself," *Stern v. Marshall*, 564 U.S. 462, 499 (2011), the bankruptcy court had the constitutional authority to enter a final judgment in this proceeding. *See Dilbay v. Demir (In re Demir)*, 500 B.R. 913, 918 (Bankr. N.D. Ill. 2013). The Court continues to have jurisdiction over this proceeding since the withdrawal of the reference.

## II. Procedural History

The Debtor filed a voluntary petition for relief under Chapter 7 of the Bankruptcy Code on September 6, 2019. The UST timely brought this adversary proceeding seeking the denial of the Debtor's discharge under § 727(a)(2), (3), and (4). The Debtor is separately subject to three adversary proceedings under § 523(a) for nondischargeability of particular debts, which have been held in abeyance by the agreement of the parties pending the outcome of this matter.[2]

Before the trial, the parties stipulated to certain facts (Adv. Doc. 29) (the "Stipulations"), and the UST filed a pretrial brief (Adv. Doc. 30). During the trial held June 8, 2021,[3] the Court heard the testimony of two of the Debtor's creditors, Chad Peterson and

---

[1] The Court will refer to any documents filed in the Debtor's main bankruptcy case, *In re James M. Pack*, No. 19-bk-55732 (Bankr. S.D. Ohio), as "Bankr. Doc. —" and any documents filed in the bankruptcy court adversary proceeding, *U.S. Tr. v. Pack*, No. 20-ap-2031 (Bankr. S.D. Ohio), as "Adv. Doc. —." Any references to this Court's docket will be "Distr. Doc. —."

[2] *See Starner v. Pack*, Adv. No. 19-ap-2153 (Bankr. S.D. Ohio); *Bortner v. Pack*, Adv. No. 19-ap-2154 (Bankr. S.D. Ohio); *MP Equip. Leasing, Inc. v. Pack*, Adv. No. 19-ap-2157 (Bankr. S.D. Ohio).

[3] This case was tried during the COVID-19 pandemic. To protect the health and safety of the litigants and court staff, the case was tried remotely with lawyers and witnesses appearing *via* Zoom for Government. *See* Bankr.

David Bortner, who each had business dealings with the Debtor; Jacquelyn Snyder, an auditor with the UST's Office; Ray Combs, the Debtor's business partner; and the Debtor himself. The UST's Exhibits 1–4, 8, 11, 13–15, 20 and 21, the Debtor's Exhibit A, and Joint Exhibits AA–NN were admitted into evidence. *See* Adv. Doc. 32 (the "Transcript") at 109, 117, 172.[4] The parties requested to submit their closing arguments through post-trial briefs following the docketing of the Transcript. *Id.* at 159–60; *see also* Adv. Doc. 34. With the filing of those briefs, *see* Adv. Docs. 36 & 37, the Court took the matter under advisement.

### III. Findings of Fact

Based on the parties' stipulated facts and the evidence adduced at trial, including the documentary evidence and the testimony provided, and having considered the demeanor and credibility of the witnesses, the Court makes the findings of fact set forth below.

### A. The Debtor's Prepetition Business Interests

In the several years before filing bankruptcy, the Debtor owned and operated multiple businesses. His schedules and statement of financial affairs ultimately reflected that the Debtor had an interest in about a dozen entities. Much of the parties' presentation at trial focused on a few "sets" of companies that the Court will describe below—(1) Rush Creek Logistics, LLC ("Rush Creek") and Peterson Trucking; (2) Glenco Equipment Company

---

S.D. Ohio Gen. Order 35-8, *Order Regarding Matters Scheduled Before the Court Until Further Notice* (Sept. 17, 2020); Bankr. S.D. Ohio Gen. Order 44-1, *Order Regarding Virtual Hearings* (Aug. 21, 2020).

[4] UST Exhibit 5 was a compilation of information from the Ohio Secretary of State's website regarding the Debtor's various businesses created by an individual with the UST's office. The Court sustained the Debtor's objection to the exhibit as having no foundation. Tr. at 114, 117. The Court notes, however, that it can (and below does) take judicial notice of the public records maintained by the Secretary of State, and it will do so for the purpose of spelling out the factual background. *See* Fed. R. Evid. 201(b)(2); *Dayton Veterans Residences Ltd. P'ship v. Dayton Metro. Hous. Auth.*, No. 3:16-CV-466, 2022 WL 1913334, at *2 (S.D. Ohio June 3, 2022) ("[P]ublic records maintained by secretaries of state related to the organization of business entities are the type of records to which courts in this District often have afforded judicial notice." (quoting *Morse v. Fifty W. Brewing Co. LLC*, No. 1:21-cv-377, 2022 WL 974342, at *3 (S.D. Ohio Mar. 31, 2022))); *Bavely v. Daniels (In re Daniels)*, 641 B.R. 165, 178 (Bankr. S.D. Ohio 2022) ("The Court may take judicial notice of a public record like the Ohio Secretary of State's website.").

LLC ("Glenco") and Niblock Machinery; and (3) Universal Earthworks and a group of companies that the Court will collectively refer to as the Arcus Entities.

### 1.     Rush Creek and Peterson Trucking

The Debtor is the President and sole owner of Rush Creek Logistics, LLC, an entity created in May 2016[5] to purchase and manage a Wisconsin-based business, Peterson Trucking. Stips. ¶ 11–13; *see also* Tr. at 15–16, 142. Rush Creek fulfilled this purpose shortly thereafter, executing a contract to purchase Peterson Trucking sometime between July and August 2016. Tr. at 15–16. Following the acquisition, the Debtor assumed the role of President for Peterson Trucking as well. *Id.* at 44; Stips. ¶ 14.

Upon purchase, Rush Creek acquired Peterson Trucking's cash on hand and accounts receivable. Tr. at 17. Its founder and former owner, Chad Peterson, testified that Peterson Trucking had around $20,000 to $25,000 in cash on hand at the time it was sold to Rush Creek in summer 2016. *Id.* It also had somewhere between $300,000 and $400,000 in accounts receivable, which Mr. Peterson described as "a hundred percent" collectable. *Id.* at 16–17; *id.* at 41 (Debtor testifying that Peterson Trucking had $300,000–350,000 in accounts receivable); *see also id.* at 42 (Debtor testifying that he took out a roughly $500,000 line of credit based on Peterson Trucking's accounts receivable). At trial, the UST introduced a balance sheet from Peterson Trucking showing total assets of $1,076,576.24, including accounts receivable of some $532,000, as of the end of September 2016—i.e., within a month or two of the acquisition. UST Ex. 2 at 7. Peterson Trucking did not own any real estate and it leased "most if not all [of its] equipment." Tr. at 56.

---

[5] The Ohio Secretary of State reflects that Articles of Organization for Rush Creek Logistics, LLC, with the Debtor Jim Pack as statutory agent, were filed May 31, 2016. Ohio Sec'y of State, Business Details, *Entity 3910722*, https://businesssearch.ohiosos.gov?=businessDetails/3910722.

The Debtor testified that Peterson Trucking ran into "substantial issues" shortly after its acquisition. *Id.* at 43. The general manager in Wisconsin, upset that he was not given an opportunity to purchase Peterson Trucking, left to work for a competitor and "took a substantial amount of business with him." *Id.*; *see also id.* at 138–39. Peterson's bookkeeper likewise left to work for the same competitor around February 2017. *Id.* at 45–46. According to the Debtor, this competition meant Peterson Trucking "immediately became unproductive." *Id.* at 43; *see also id.* at 40–41 (Debtor recounting that, sometime after the sale, Peterson Trucking's bookkeeper advised him that "they didn't think they would be able to make payroll that Friday" and asked "if it was okay if they took money out of the company savings account"); *id.* at 139 (Debtor testifying that Peterson Trucking became "grossly unprofitable" following the general manager's departure). In light of these liquidity issues, the Debtor took out a $100,000 loan and a half-million-dollar line of credit, both personally guaranteed, to continue operating Peterson Trucking. *Id.* at 41–43, 138. Despite the cash infusion, Peterson Trucking ceased operations around spring 2017, less than a year after its acquisition. *Id.* at 48–49, 56. With no further business, Rush Creek appears to have also closed its doors. *See id.* at 54–56, 95, 142. *But see* Joint Ex. AA at 47 (Debtor's original Statement of Financial Affairs identifying Rush Creek as operating "5/30/16 to Present").

## 2.      Glenco and Niblock Machinery

The Debtor was the President of Glenco Equipment Company, an equipment dealer started in late 2015. Tr. at 58, 96.[6] Not long after its formation, the Debtor orally granted Mr.

---

[6] The Ohio Secretary of State shows that Glenco was originally registered in 2007 as Glenco Financial Services, LLC; the company changed its name to Glenco Equipment Company, LLC on November 17, 2015. Ohio Sec'y of State, Business Details, *Entity 1701161*, https://businesssearch.ohiosos.gov?=businessDetails/1701161; *see also* Tr. at 57–58.

Combs a 20% financial-only interest in Glenco in exchange for his "hard work." *Id.* at 57–58; *see also* Stips. ¶ 15. Glenco employed the Debtor's wife and one of his sons, and the Debtor took distributions outside of a schedule. Tr. at 59–61.

In August 2017, Glenco acquired Niblock Machinery, a company that sold and serviced machinery in the RV industry. Tr. at 25, 68–69; Stips. ¶ 16. The Debtor became Niblock's President and CEO. Stips. ¶ 17. All Niblock's assets—including its equipment, cash, and accounts receivable—were transferred to Glenco. Tr. at 29. According to the financial reports attached to the stock purchase agreement, Niblock had total assets of $980,668 as of June 30, 2017, just a couple of months before the acquisition. *See* UST Ex. 3, attachment B at 35; Tr. at 28–29 (testimony of David Bortner, former owner of Niblock). And even as of December 31, 2017, Niblock's balance sheet (albeit marked up with the handwritten note "to verify") reflected over $926,000 in total assets. *See* Joint Ex. JJ. For the first several months following the acquisition, Niblock and Glenco were operated separately and kept separate books. But in early 2018, Glenco absorbed Niblock's operations, creating a "Niblock division." Tr. at 66–68; *see also id.* at 58–59 (Debtor describing Glenco's multiple divisions).

In the summer of 2018—about one year after being acquired by Glenco—Niblock's assets were liquidated. *Id.* at 69. The Debtor testified that, unable to afford an "in-depth appraisal" and "desperately needing cash," Niblock accepted a $150,000 offer to purchase its machinery from a competitor. *Id.* at 69–70. Niblock also sold its scrap, but the Debtor did not recall how much the company received for it. *Id.* at 70–71. The company also brought in "rigging fees"—basically, fees to help load auctioned machinery or otherwise prepare it for

transport—but the Debtor did not know how much. *Id.* at 71. Finally, the company received around $239,000 from the sale-leaseback of its building with an unrelated third party. *Id.*[7]

The Debtor explained that, like Peterson Trucking, Niblock faced competition from a disgruntled sales representative who "left the company because, again, he was upset that he didn't get a chance to buy it" and interfered with Niblock's relationship with its manufacturers. *Id.* at 152–53. The Debtor also alleged that Mr. Bortner, who had sold Niblock to Glenco, had overinflated the value of its assets, "[s]o that brought down Glenco and . . . it was like one mess after another." *Id.* at 153. By late 2018, Glenco and its remaining divisions ran out of money and ceased operations. *See id.* at 58, 62.

### 3.    Universal Earthworks and the Arcus Entities

The Debtor started Universal Earthworks in the summer of 2018 and served as its president. Tr. at 74–75. Universal Earthworks leased a hydro-excavating truck—a high-priced piece of construction equipment that uses high-pressure water to dig—from the manufacturer and in turn hired it out for individual jobs, with the goal of effectuating the truck's sale. *Id.* at 74–76. The Debtor testified, though, that this was a "hard sell" and that Universal Earthworks only ever had one job. *Id.* at 76. Sometime in October or November 2018, Universal Earthworks was converted into Arcus Development. *Id.* at 76–77.[8]

Arcus Development—along with Arcus Supply LLC, Arcus Lease, LLC, and Team Arcus, LLC—was a subsidiary of Arcus Holdings, LLC (collectively, the "Arcus Entities"). Stips. ¶ 8(e); Tr. at 78. Like Universal Earthworks, Arcus Holdings was started in summer of

---

[7] The Transcript states that "Mr. Bortner sold the building to an unrelated third party through *(indiscernible) stock.*" Tr. at 71 (emphasis added). This appears to have been a transcription error.

[8] The Ohio Secretary of State's website shows that Universal EarthWorks (which until July 2017 was known as Glenco Peterson Group, LLC) changed its name to Arcus Development, LLC on November 29, 2018. Ohio Sec'y of State, Business Details, *Entity 3941729*, https://businesssearch.ohiosos.gov?=businessDetails/3941729.

2018, followed later that year by the remaining Arcus Entities.[9] Arcus Development wired telephone poles and did other construction projects for utility companies. Tr. at 77–78. Arcus Lease did equipment and truck repair, Arcus Supply sold parts, and Team Arcus served as the employer of the individuals who worked for the Arcus Entities. *Id.* at 79–80. But, the Debtor testified, business for the Arcus Entities "just couldn't ramp up," and with payroll of $12,000–15,000 a week and facilities rent of $35,000, they "burned through [the] money very quickly." *Id.* at 153–54. The Arcus Entities operated for less than a year. Arcus Development, the last one standing, ceased operations in May or June 2019, just a few months before the Debtor's bankruptcy filing. *Id.* at 81–82.

## B. Company Records

One of the primary issues here is the maintenance and retention of company records. The only business records that the Debtor produced were seven banker boxes containing various records from Glenco, Niblock, and the Arcus Entities. Stips. ¶ 23; Tr. at 72. No records were supplied for Rush Creek or Peterson Trucking. Stips. ¶ 21; *see also* Tr. at 54–55.

The Debtor offered various explanations for why no other records were produced. The parties stipulated that the Debtor "kept financial records for all businesses he had an interest in through [the accounting software] QuickBooks which was stored through a business that operated on a cloud server." Stips. ¶ 25; *see also* Tr. at 61–62, 82, 141. The Debtor testified, though, that he could not access any of these records because he could no longer afford the

---

[9] The Ohio Secretary of State shows that Arcus Holding's articles of organization were filed on June 26, 2018. Ohio Sec'y of State, Business Details, *Entity 4203620*, https://businesssearch.ohiosos.gov?=businessDetails/4203620. The company previously known as Glenco Manufacturing, LLC became Arcus Supply on November 16, 2018. Ohio Sec'y of State, Business Details, *Entity 4116387*, https://businesssearch.ohiosos.gov?=businessDetails/4116387. And articles of organization for Team Arcus were filed on November 29, 2018. Ohio Sec'y of State, Business Details, *Entity 4260291*, https://businesssearch.ohiosos.gov?=businessDetails/4260291. The Court did not locate Secretary of State records for Arcus Lease.

subscription. Stips. ¶ 25; Tr. at 62 (Debtor testifying that they stopped paying for QuickBooks "when [they] ran out of money[, s]ometime in 2018"); *see also* Tr. at 141–42 (Debtor describing the QuickBooks subscription as $900–1,000 a month and a subscription for the cloud service as a "couple thousand dollars" extra). The Debtor's business partner, Mr. Combs, offered similar testimony. Tr. at 163–64 ("[A]ll the paperwork and stuff is up in the cloud . . . . We weren't able to get it out . . . . We just couldn't pay for it. We didn't have the money to pay for it."). The Debtor also testified that he could not afford to obtain bank statements for Glenco, Niblock, or Rush Creek because the accounts for those companies had been closed and the banks were "going to charge [him] like $30 a page and [he] just couldn't afford it." *Id.* at 149. The Debtor did not testify as to when those accounts were closed.

Somewhat in conflict with his stipulation, the Debtor's testimony at trial suggested that, unlike Glenco, Niblock, and the Arcus Entities, neither Peterson Trucking nor Rush Creek had a QuickBooks subscription—or at least not a cloud-based one. Instead, Peterson Trucking's records were stored locally on a computer in Wisconsin. Tr. at 46 (Debtor stating, as to Peterson Trucking's records, "I believe they were on QuickBooks, on [the bookkeeper's] computer, stored locally in Wisconsin"); *id.* at 62 (Debtor, when asked whether "the [QuickBooks] subscription for Glenco [would] have been separate from the subscription for Rush Creek/Peterson Trucking," responding "they didn't have the subscription, so they were on a computer in Wisconsin"). There was no clear explanation for why the Peterson Trucking records could not be accessed—the Debtor suggested that the computer containing all its records was still in Wisconsin, perhaps because Chad Peterson had kept it. *Id.* at 54–55, 141. The Debtor also did not have his own digital or hard copies of Peterson Trucking's financial records. *See id.* at 46–47 (Debtor responding in the negative when asked whether he ever

"requested copies [of documents like the profit and loss statement at UST Ex. 2] to be sent to [him] to store digitally, or to store a hard copy of records"). Similarly, Rush Creek's records were kept on a laptop computer, and the Debtor's explanation for why he could not access them was that the laptop broke after being dropped and they "couldn't get it to turn on." *Id.* at 56; *see also* Stips. ¶ 22.

The Debtor also had issues accessing electronic financial records for Niblock, which had been stored on a computer brought to Ohio from Niblock's office in Indiana. When asked about it, the Debtor stated: "we tried to turn it on and make it work. And we couldn't. The data would not propagate up. I don't know what happened to it or what caused it. I'm not a computer person, either. . . . But one of us [Mr. Combs or the Debtor] did bring back a computer, but it wouldn't work." Tr. at 156–57. Apart from their inability to access the cloud-based QuickBooks records, Mr. Combs did not recollect any computer issues. *See id.* at 164 (not responding with a computer issue when asked "Did you have any other issues? Broken computers, anything like that?" and answering "Not that I'm aware of" when asked whether he had "any other issues with computers or servers or iPads or anything else that had information about these companies").

As for physical copies of other financial records, the Debtor maintains that they were destroyed or that he otherwise could not access or locate them. "Many of the business records from Niblock Machinery were shredded." Stips. ¶ 20. And other boxes of records from Peterson Trucking and Glenco were likewise shredded or thrown away. *See* Stips. ¶ 21; Tr. at 140. The Debtor testified that this was an accident. As he described it, sometime in spring 2019 when they were cleaning out their leased property:

> a couple of employees . . . inadvertently had thrown boxes away
> or gave them to the shedding company. The original intent was

> to give the boxes of drivers' files [from Peterson Trucking] so they wouldn't have an identity theft problem and [the employees] threw away boxes that they shouldn't have or gave them to the shredding person.

Tr. at 140–41; *see also id.* 157–58. The Debtor, though, was not there. Instead, Mr. Combs was one of several employees present when the shredding company came to collect the boxes. *Id.* at 166–68. He testified that all the boxes intended for the shredding company were being put on a skid. At first, Mr. Combs denied that he directed the boxes of financial records to be put there: "[w]e had everything in one area and they just w[ere] grabbing stuff, putting [it] on the skids." *Id.* at 167. But Mr. Combs also acknowledged that he directed the employees to start stacking boxes on the skid—just that he "didn't realize until afterwards" that one or multiple of the employees were "grabbing stuff that [they] had set off to the side." *Id.* at 168. Mr. Combs further testified that no one reviewed the records before they were placed on the skid. *Id.* Two of the employees involved were Mr. Combs' sons. *Id.* at 171.

As to the seven banker boxes of records that *were* provided, the auditor from the Office of the UST, Ms. Snyder, testified that they included "consumer files, vendor files, receivables, payables, . . . invoices, purchase orders," and bank reconciliations. Tr. at 106–07; *see also id.* at 72 (the Debtor testifying that the banker boxes contained "[j]ust a variety of business records, a lot of payables, I think, expense items for several entities"). Ms. Snyder, who has a history of reviewing Chapter 11 business cases, typically looks for a balance sheet (to determine the business's assets, liabilities, and equity) and income statements (to determine revenue, costs, and expenses). *Id.* at 107–08. Ms. Snyder testified that she spent several hours reviewing the documents provided, but she could not ascertain the Debtor's financial condition from what was provided. *Id.* Even the Debtor acknowledged that there was "not enough information" in the records available to create a tax return. *Id.* at 72–73. The Debtor

11

also casted doubt as to whether the records provided for himself and his companies were accurate. *See id.* at 63–64 (Debtor asserting that there were discrepancies in Niblock's income statements and that Mr. Bortner's testimony about Niblock's assets just before the acquisition was incorrect); *id.* at 87–91 (Debtor stating that his personal tax returns for 2016 and 2017 may need to be amended following inquiries as to discrepancies in his income); *see also id.* at 93–95 (when asked about $545,000 of "other expenses" on a Niblock balance sheet, UST Ex. NN, Debtor stating, "it goes to my point that we needed a CPA to come in and get the books straight . . . These are uncharted, just put into the system raw").

On top of potential inaccuracies, the records admitted into evidence at trial—some of which had been provided by the Debtor and some of which had been obtained by subpoena—showed some questionable or unexplained transfers. For example, bank account statements for Glenco, attached to which were internally prepared reconciliation details, reflected that between May and September 2018, Glenco had made numerous transfers to Rush Creek—a company that had ceased operations a year earlier. *See* UST Ex. 11 at 31, 39, 46. When asked about these transfers, the Debtor testified that he made the decision to have Rush Creek and Glenco "enter[] into an agreement" to pay back the $100,000 loan that had been taken out—and personally guaranteed by the Debtor—to operate Peterson Trucking. Tr. at 42–43, 95–96. And even though Glenco apparently ran out of money and ceased operating in late 2018, the Glenco bank statements show that in February 2019, after receiving a deposit of $33,800 from what may have been another Glenco bank account,[10] Glenco transferred $34,000 to an account owned by either Universal Earthworks or Arcus Development. *See* UST Ex. 11 at 1–

---

[10] The Glenco bank records admitted at UST Exhibit 11 show that the transfer came from a checking account ending in -1566. UST Ex. 11 at 1. The UST's exhibit list identified "Glenco Equipment Company, LLC Chase Account ending in 1566" that the UST intended to offer into evidence as UST Exhibit 12. Adv. Doc. 27. The UST did not, however, end up doing so.

2 (bank statement showing deposit of $33,800 from account -1566 and then transfer of $34,000 to account -2827, both on 2/5/2019); *id.* at 13 (bank statement showing transfer of $2,000 to account -2827 on 12/10/2018); *id.* at 10 (reconciliation detail identifying the $2,000 transfer on 12/10/2018 as being made to Universal Earthworks); *see also* Tr. at 76, 81 (Debtor stating that "Universal Earthworks became Arcus Development and it had its own bank account").

When asked about a $58,000 check to himself from Arcus Holdings on November 29, 2018, the Debtor testified that, although he normally received a monthly distribution of around $8,000–10,000, it had been some five months since he had received a draw. Tr. at 97 ("Because the previous five months, I believe it was, for a previous time [I] had really not been paid a whole lot, so I was trying to recoup personally. . . . [T]hat was for the 50, and then the $8,000 was my draw moving forward, so when it was able to pay me, it did."); *see also id.* at 147 (testifying same). But the reconciliation details accompanying Glenco's bank statements reflect that Glenco paid the Debtor $1,500 on September 13, on September 20, and again on September 26, 2018. UST Ex. 11 at 31, 34. And, while also confirming these deposits, the Debtor's personal bank statements reflect additional deposits of $1,500 each on August 24, August 29, and September 6, 2018—suggesting that at least for a couple of those prior months, the Debtor had been taking some sort of distribution. UST Ex. 14 at 1, 3.[11]

Finally, at the end of November 2018, Arcus Holdings engaged in a sale-leaseback that infused it with over $802,000. Tr. at 97–98, 134, 151–52.[12] Then between December 2018 and April 2019, the Arcus Holdings bank account transferred nearly $575,000 into a bank account

---

[11] The Debtor's personal bank statements admitted as UST Exhibit 14 only went as far back as August 14, 2018.

[12] Although the Transcript reflects that the Debtor called this a "sale restock," that appears to be a transcription error. *See* Tr. at 98 (Debtor going on to describe that "somebody wanted to buy [the property] and lease it back to us, so I facilitated that. And that [the transfer of $802,000] was the net proceeds from that.").

ending in -3918—an unidentified bank account that at times also made deposits directly into the Debtor's personal account. *See* UST Ex. 20 (reflecting transfers from Arcus Holdings to account -3918); UST Ex. 14 at 14, 25, 31, 34 & 38 (showing transfers into Debtor's personal account from -3918).

**C.     The Debtor's Bankruptcy Filings**

Although the Court does not reach whether the Debtor's discharge should be denied for making a false oath under § 727(a)(4) or concealing property under § 727(a)(2), it will briefly review the factual background for those claims.

When the Debtor filed his bankruptcy petition and schedules on September 6, 2019, he reported that he had used no business names or Employer Identification Numbers in the eight years prior. Stips. ¶ 4–5; Joint Ex. AA at 2. And in his initial Schedule A/B, the Debtor claimed to not have current ownership interest in any "non-publicly traded stock and interests in incorporated and unincorporated business, including an interest in an LLC, partnership, and joint venture." Stips. ¶ 6; Joint Ex. AA at 13. In his initial Statement of Financial Affairs ("SOFA"), the Debtor listed historical and present ownership interests in only four businesses: Glenco, Rush Creek, Arcus Lease, and a company called Scioto Risk Management, LLC. Stips. ¶ 7; Joint Ex. AA at 46–47. The Debtor signed these documents under penalty of perjury. At his § 341 meeting of creditors, the Debtor again reaffirmed under oath that he had reviewed his petition, schedules, and SOFA before filing and that they were "accurate and complete to the best of his knowledge." Stips. ¶¶ 6, 9; Joint Ex. AA at 6, 40, 47. A little over a month after filing his bankruptcy petition, the Debtor filed a first amended Schedule A/B, but the only change was to disclose an interest in the contingent or unliquidated claims involved in a prepetition lawsuit. Bankr. Doc. 11 at 5.

On February 12, 2020—some five months after filing bankruptcy and immediately following the UST's examination of the Debtor under Bankruptcy Rule 2004—the Debtor filed a second amended Schedule A/B and an amended SOFA. Stips. ¶ 8. The Debtor's schedules, which had previously disclosed no ownership interest in any companies, now disclosed his interest in eight companies, including Arcus Holdings (50% interest), Rush Creek (80% interest), and Glenco Holdings Group, LLC (no interest share reported). *Id.*; Joint Ex. BB at 4. The Debtor's amended SOFA likewise disclosed these new companies and clarified that Arcus Holdings was the parent company of the subsidiary Arcus Entities. Joint Ex. BB at 13.

Despite the amendments, there were still inaccuracies. For example, the Debtor still did not list any present or past relationship to Niblock. And although his amended schedules disclosed only an 80% interest in Rush Creek, the Debtor was in fact its sole owner. Joint Ex. BB at 4; Stips. ¶ 11. The Debtor testified that he had intended to give Mr. Combs a 20% interest in but it was never formalized. Tr. at 39, 133–34. The inaccurate disclosure of this interest on his schedules, he claimed, resulted from a misunderstanding with counsel. *Id.*

When asked at trial why his initial schedules did not disclose all his businesses, the Debtor explained:

> [My attorney] uses a computer program for his clients to fill out the information that ultimately drives the filling out of the blanks on a bankruptcy petition. And so when I was filling out the computer program, I was at home, I stayed home that day. Actually worked on it most of the day and I was having issues with the internet and the electricity flashed a couple times and it caused the computer program—in hindsight, it didn't save all of the information that I was trying to put into it and list all of the entities that I had been involved in over the last six or eight years, as [my attorney] advised me to do. I didn't realize it hadn't saved

> them all and that is the reason why [] they were inadvertently left
> off.

*Id.* at 130. The Debtor testified that he then "inadvertently did not do a thorough review" of
the petition and schedules before signing, because during the signing meeting, he and his
attorney got caught up discussing potential adversary proceedings that could be filed against
him. *Id.* at 131–32.

## IV. Legal Analysis

Because denial of a debtor's discharge is a harsh remedy, exceptions should be "strictly
construed in favor of the debtor." *United States v. Storey*, 640 F.3d 739, 743 (6th Cir. 2011).
The party objecting to the debtor's discharge "bears the burden of proof by a preponderance
of the evidence." *Buckeye Ret. Co. v. Swegan (In re Swegan)*, 383 B.R. 646, 653 (B.A.P. 6th Cir.
2008); *see also Barclays/Am. Bus. Credit, Inc. v. Adams (In re Adams)*, 31 F.3d 389, 394 (6th Cir.
1994) (establishing burden of proof for § 727 actions). Still, "a discharge is a privilege, and not
a right, and should only benefit an honest debtor." *CM Temp. Servs., Inc. v. Bailey (In re Bailey)*,
375 B.R. 410, 415 (Bankr. S.D. Ohio 2007) (citing *In re Juzwiak*, 89 F.3d 424, 427 (7th Cir.
1996)).

## A. Section 727(a)(3)

The UST asserts that the Debtor's discharge should be denied under § 727(a)(3)
because he has failed to provide business records for several of the businesses he had an
interest in prepetition, including Glenco Equipment, Niblock Machinery, Peterson Trucking,
and all of the Arcus entities. Under § 727(a)(3), a debtor's discharge must be denied if:

> the debtor has concealed, destroyed, mutilated, falsified, or failed
> to keep or preserve any recorded information, including books,
> documents, records, and papers, from which the debtor's
> financial condition or business transactions might be

16

> ascertained, unless such act or failure to act was justified under
> all of the circumstances of the case.

11 U.S.C. § 727(a)(3). This section "aims 'to make the privilege of discharge dependent upon a true presentation of the debtor's financial affairs' by requiring the debtor to supply the trustee and creditors with 'dependable information on which they can rely in tracing a debtor's financial history.'" *Bavely v. Daniels (In re Daniels)*, 641 B.R. 165, 183 (Bankr. S.D. Ohio 2022) (quoting *Lubman v. Hall (In re Hall)*, 174 B.R. 210, 214 (Bankr. E.D. Va. 1994)).

Actions brought under § 727(a)(3) are analyzed using a two-step, burden-shifting approach: first, the plaintiff "must establish a *prima facie* case showing the [d]ebtor failed to keep adequate records," and then the burden shifts to the debtor to explain why the failure to maintain records was justified. *Bailey*, 375 B.R. at 415–16; *see also Daniels*, 641 B.R. at 183. The Court has broad discretion in deciding whether to deny a debtor's discharge under § 727(a)(3). *Dolin v. N. Petrochemical Co. (In re Dolin)*, 799 F.2d 252, 253 (6th Cir. 1986). The determination "is fact specific and should be made on a case-by-case basis." *McDermott v. Roller (In re Roller)*, No. 13-6050, 2014 WL 644590, at *11 (Bankr. N.D. Ohio Feb. 19, 2014).

Courts consider the debtor's "education, business experience, sophistication, or any other relevant factor" in determining both the adequacy of the records provided and whether the debtor's failure to maintain proper records was justified. *Daniels*, 641 B.R. at 184 (quoting *Bailey*, 375 B.R. at 415). As this Court has explained:

> Courts typically place a higher burden of recordkeeping on debtors who operate businesses. Indeed, numerous courts have held that to satisfy his disclosure obligations under § 727(a)(3), a debtor may be required to provide not only his own records but also records from closely-held businesses. This is true not only when the debtor has a direct ownership interest in the business, but also when the debtor's "business and personal finances are

> intertwined." Similarly, "a sophisticated debtor is held to a greater degree of accountability than an unsophisticated debtor."

*Id.* at 184–85 (citations omitted) (first quoting *MoSex Ex. 1, LLC v. Campbell (In re Campbell)*, No. 19-00042-ELG, 2021 WL 4517424, at *5 (Bankr. D.D.C. Sept. 30, 2021); then quoting *Jou v. Adalian (In re Adalian)*, 500 B.R. 402, 409 (Bankr. M.D. Pa. 2013)). In assessing the debtor's justifications, courts consider the debtor's credibility as well as the reasonableness of and evidentiary support for the offered justifications. *See id.* at 189 (quoting *Bailey*, 375 B.R. at 416); *U.S. Tr. v. Kandel (In re Kandel)*, No. 12-6003, 2015 WL 1207014, at *11 (Bankr. N.D. Ohio Mar. 13, 2015); *see also Graham Mortg. Corp. v. Goff (In re Goff)*, 579 F. App'x 240, 246 (5th Cir. 2014) (affirming bankruptcy court's finding that failure to maintain records was not justified where debtor's "testimony, which was the only evidence supporting his justification, was not credible, and his explanations for why the relevant records were missing were not reasonable under the circumstances"). Unlike several other bases for the denial of a debtor's discharge, "[f]raudulent intent is not an element under § 727(a)(3)." *Noland v. Johnson (In re Johnson)*, 387 B.R. 728, 736 (Bankr. S.D. Ohio 2008).

### 1. The UST's Prima Facie Case

The Court has no trouble concluding that the UST established its prima facie case that the Debtor "destroyed . . . or failed to keep or preserve" records "from which [his] financial condition or business transactions might be ascertained." 11 U.S.C. § 727(a)(3). The Debtor is a sophisticated businessman who owned and operated several companies and employed many individuals. The Debtor derived his income from distributions from his companies (often outside of an ordinary distribution schedule), drove a company-owned vehicle, and effectuated intercompany transfers. *See* Tr. at 40, 59–61, 95–96. For example, even after Rush Creek stopped operating, the Debtor caused Glenco to pay off a loan that the Debtor had

personally guaranteed for Rush Creek. *See id.* at 42, 95–96. In light of the Debtor's sophistication, his direct ownership of the several businesses, and the personal and intercompany transactions he engaged in, the Court finds that the Debtor was obligated to provide records not only for himself but also for his closely held companies. And there is no real dispute that the Debtor failed to preserve or maintain many of these financial records. As to Rush Creek and Peterson, the Debtor had no records; and as to Glenco, Niblock, and the Arcus Entities, the records were limited.

Further, those records that the Debtor did provide were inadequate to permit the trustee or creditors to ascertain his financial condition and business transactions. In the several years before filing for bankruptcy, the Debtor started or acquired several businesses that had not insignificant assets. Indeed, the evidence shows that Peterson Trucking and Niblock had close to one-million dollars' worth of assets some six months before they went under. And yet the Debtor has no record of where the money went. Without these records, the trustee would have little to no ability to determine, for example, whether there were any transfers that would be avoidable for the benefit of the Debtor's estate. *See Joekel v. Ray (In re Ray)*, No. 12-3028, 2012 WL 3744721, at *3 (Bankr. S.D. Tex. Aug. 28, 2012) (finding that debtor's missing records from the four-year lookback period under the state's uniform fraudulent transfer act meant debtor's financial condition and business transactions could not be fully reconstructed). And as even the Debtor acknowledged at trial, many records that he did provide were incomplete or inaccurate. Tr. at 64–65, 72–73, 87–91.

The Court accordingly concludes that the UST met its initial burden under § 727(a)(3) of showing that the Debtor, who possessed more than a modicum of business savvy, failed to

preserve adequate records from which his business transactions or financial condition could be ascertained.

### 2.     The Debtor's Justifications

Once the objecting party makes its prima facie case, the burden shifts to the debtor to show that his action or inaction was "justified under all of the circumstances of the case." 11 U.S.C. § 727(a)(3). As noted, the Debtor has not contested that the records he provided were inadequate; instead, he rests his case on his purported justifications. And there were many: multiple computers broke, he could not afford to pay the QuickBooks subscription to access his records, hard copies were inadvertently shredded. The Court finds the explanations neither adequate nor credible based on the Debtor's demeanor on the witness stand.

The Debtor asserts that records for Rush Creek and for Niblock were housed on computers that broke, and that records for Peterson Trucking were on a computer left behind in Wisconsin. But in cases "in which the debtor's records were stored on a computer to which the debtor no longer had access, [such as] because the computer crashed or was stolen, courts have found that the computer malfunction alone may not excuse the debtor from providing financial records." *Stephens v. Morrison (In re Morrison)*, 450 B.R. 734, 747 (Bankr. W.D. Tenn. 2011) (citing cases); *cf. Sherwood Fine Art, Inc. v. Burrik (In re Burrik)*, 459 B.R. 881, 895 (Bankr. W.D. Pa. 2011) (holding that debtor's negligent failure to retrieve business records from computers before they were sold off did not provide legal justification for failure to preserve adequate records for purposes of § 727(a)(3)). A businessperson in the Debtor's position and who had been in charge of operating several companies with, collectively, millions of dollars in assets and revenue, would be expected to employ some sort of backup system to maintain important company financials. *Roberts v. Debusk (In re Debusk)*, No. 08-3015, 2008 WL

3904448, at *6 (Bankr. E.D. Tenn. Aug. 19, 2008) ("While it is a common occurrence for computers to crash and records to be lost, that fact does not excuse the Defendant from retaining backup files and/or hard copies, nor does it provide him with a convenient excuse from providing those records."), *aff'd*, No. 3:08-cv-427, 2009 WL 1256891, at *3 (E.D. Tenn. May 1, 2009) (noting on appeal that the debtor's failure to keep a backup "is all the more egregious given that the records at issue concern debtor's business, not merely his personal files").

The inaccessibility of the companies' files because of the lapse in their QuickBooks subscription likewise does not provide sufficient justification for the Debtor's lack of records. First, the justification is relatively unsupported. All the Court has, beyond the Debtor's self-serving testimony, is Mr. Combs' statement that they "just couldn't pay for it." Tr. at 163–64. The record is unclear as to when the companies stopped paying for their QuickBooks and cloud subscriptions (or even which companies did pay for these), so the Court lacks evidence of the companies' financial status at the time of nonpayment. And as with other electronically maintained files, a company would be expected to maintain backups, such as by downloading the data or printing the reports. This is all the more true given that the Debtor knew or should have known that the companies were ending their subscription to QuickBooks and whatever other cloud-based storage companies they maintained.

The Debtor's final justification for not having financial records is that most paper files he had were accidentally shredded. The testimony at trial suggested that the Debtor and Mr. Combs had arranged for a shredding company to destroy specific documents—boxes of drivers' files from Peterson Trucking (such as applications and W-4s) to avoid identify theft issues as they moved out of their leased property in spring 2019. Tr. at 140, 157–58. But when

it came time to load boxes for the shredder, more than just the drivers' files were included. Some aspects of the story cause the Court to raise an eyebrow—like the timing of the destruction (being just three to six months before the Debtor's bankruptcy filing), or like how no one noticed that so many boxes were being stacked for shredding when only a limited subset of files were intended to be destroyed. Even though the Debtor's alleged intentions in destroying documents may have been good, even a "misinformed assumption [can] lead[] to disastrous consequences." *Ray*, 2012 WL 3744721, at *4 (denying, under § 727(a)(3), discharge of debtor who destroyed financial and business records to protect confidential client information and on the assumption that he did not need to keep more than three years' worth for tax purposes).

In the end, the Debtor had an excuse for just about everything. And when taking them altogether, the excuses strain credulity. *See Kandel*, 2015 WL 1207014, at *4 ("Debtor's totally unsupported excuses were of the 'dog ate my homework' ilk: roof collapse, flood, and computer virus."). At worst, they suggest the Debtor has acted nefariously; at best, he has been extraordinarily unlucky. After hearing the testimony, weighing the witnesses' credibility, and reviewing the record, the Court believes that the truth is somewhere in between—that the Debtor has exhibited a pattern of negligence and lack of supervision in his duty to keep and preserve records. Unfortunately for the Debtor, this suffices to bar his discharge under § 727(a)(3). *See Tow v. Henley (In re Henley)*, 480 B.R. 708, 781 (Bankr. S.D. Tex. 2012) ("Mere negligence in failing to keep and produce records will suffice to bar discharge."); *Varco Pruden Bldgs., Inc. v. Kennington (In re Kennington)*, 393 B.R. 430, 434 (Bankr. N.D. Miss. 2008); *see also Johnson*, 387 B.R. at 736 ("Fraudulent intent is not an element under § 727(a)(3).").

Accordingly, based on the testimony and exhibits presented, as well as the arguments of the parties, the Court finds that the Debtor has failed to sufficiently justify his "failure to keep or preserve" records "from which [his] financial condition or business transactions might be ascertained" and that the Debtor's discharge should therefore be denied. 11 U.S.C. § 727(a)(3).

**B.     Section 727(a)(2) and (a)(4)**

Because the Court finds that the Debtor's discharge must be denied under § 727(a)(3), it need not address the Trustee's assertion that the Debtor also should be denied a discharge under § 727(a)(2) or (a)(4) for his failure to disclose his ownership interest in multiple companies. *See Harker v. West (In re West)*, 328 B.R. 736, 754 (Bankr. S.D. Ohio 2004); *McClendon v. DeVoll (In re DeVoll)*, 266 B.R. 81, 98 (Bankr. N.D. Tex. 2001) ("If any one ground for a denial of discharge is established, the Court does not need to decide the propriety of any of the other grounds."); *cf. Church Joint Venture, L.P. v. Blasingame (In re Blasingame)*, 559 B.R. 692, 700 (B.A.P. 6th Cir. 2016) (declining to address alternative bases for denial of discharge on appeal where it upholds the denial on one ground).

The Court notes, however, that the evidence presented in this case closely resembles the facts in *Chalik v. Moorefield (In Chalik)*, 748 F.2d 616 (11th Cir. 1984). There, the debtor omitted from his bankruptcy schedules twelve corporations in which he held a substantial interest in six years preceding his bankruptcy. The debtor subsequently disclosed his interests at a Rule 2004 examination but maintained that the omission was immaterial because the corporations were worthless. The Eleventh Circuit affirmed the denial of a discharge under 11 U.S.C. § 727(a)(4), finding that the omission interfered with the investigation of the debtor's financial condition and prior dealings by his creditors who were "entitled to judge

for themselves what will benefit, and what will prejudice, them" in their search for repayment of any amounts owed. *Id.* at 618. In this case, the Debtor disclosed his ownership interests in several companies only after being subjected to a Rule 2004 examination by the UST. And even then, the Debtor, after meeting with his bankruptcy attorney, still failed to list in the amended schedules, signed under penalty of perjury, his past or present interest in Niblock. In cases such as this, courts have consistently stated that it is fundamental for debtors to list *all* interests and relationships with companies they have had prior to filing bankruptcy. After all, "[c]omplete financial disclosure is a prerequisite to the privilege of discharge." *Keeney v. Smith (In re Keeney)*, 227 F.3d 679, 685 (6th Cir. 2000) (emphasis added) (quotation marks omitted).

## V.   Conclusion

For the reasons stated above, the Court finds that the Debtor's discharge must be **DENIED** under § 727(a)(3) of the Bankruptcy Code and that judgment should be granted in favor of the UST and against the Debtor. The Court will enter a separate judgment entry in accordance with this opinion.

**IT IS SO ORDERED.**

Dated:  July 21, 2023

Hon. Jeffery P. Hopkins
United States District Judge